UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

JULIE ELLEN FERREIRA,         )
         )
    Plaintiff,        )
         )
    v.         )    Case No. 3:18-cv-30115-KAR
         )
ANDREW SAUL,         )
Commissioner of Social         )
Security Administration,         )
         )
    Defendant.        )


MEMORANDUM AND ORDER REGARDING PLAINTIFF'S MOTION FOR JUDGMENT ON THE PLEADINGS AND DEFENDANT'S MOTION TO AFFIRM THE DECISION OF THE COMMISSIONER
(Docket Nos. 14 & 22)

ROBERTSON, U.S.M.J.

I.    INTRODUCTION

Julie Ellen Ferreira ("Plaintiff") brings this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) seeking review of a final decision of the Commissioner of Social Security ("Commissioner") denying her application for Supplemental Security Income ("SSI"). Plaintiff applied for SSI on March 17, 2014, alleging a January 1, 2014 onset of disability (Administrative Record ("A.R.") at 376) based on multiple sclerosis, fibromyalgia, migraines, headaches, and mitral valve prolapse (A.R. 402-03). On May 25, 2016, after hearing, the Administrative Law Judge ("ALJ") found that Plaintiff was not disabled and denied her application for SSI (A.R. at 221-39). On June 15, 2017, the Appeals Counsel vacated the hearing decision and remanded the case to the ALJ (A.R. 242-43). Following a second hearing, the ALJ again found that Plaintiff was not disabled (A.R. 12-35). This time, the Appeals Council denied review (A.R. 1-6) and the

ALJ's decision became the final decision of the Commissioner, entitling Plaintiff to judicial review. *See Smith v. Berryhill,* 139 S. Ct. 1765, 1772 (2019).

Plaintiff appeals the Commissioner's denial of her claim on the grounds that: (A) the ALJ's findings in the first and second decisions concerning the list of Plaintiff's severe impairments are inconsistent and this inconsistency was an error of law requiring remand for clarification; and (B) the ALJ erred by finding that Plaintiff's statements about the intensity, persistence, and limiting effects of her symptoms were not wholly consistent with the record and by not assessing additional limitations in her residual functional capacity ("RFC") (Dkt. No. 15 at 7-17). Pending before this court are Plaintiff's Motion for Judgment on the Pleadings (Dkt. No. 14), and the Defendant's Motion to affirm the Commissioner's Decision (Dkt. No. 22). The parties have consented to this court's jurisdiction (Dkt. No. 13). *See* 28 U.S.C. § 636(c); Fed. R. Civ. P. 73. For the reasons stated below, the court will grant the Commissioner's motion and deny Plaintiff's motion.

II.    <u>LEGAL STANDARDS</u>

A.    <u>Standard for Entitlement to SSI</u>

To qualify for SSI, a claimant must demonstrate that she is disabled within the meaning of the Social Security Act.[1] A claimant is disabled for purposes of SSI if she "is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). A claimant is unable to engage in any substantial gainful activity when she is

---

[1] There is no challenge to Plaintiff's financial need for purposes of entitlement to SSI. *See* 42 U.S.C. § 1381a.

not only "unable to do [her] previous work, but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which [s]he lives, or whether a specific job vacancy exists for [her], or whether [s]he would be hired if [s]he applied for work."  42 U.S.C. § 1382c(a)(3)(B).  The Commissioner evaluates a claimant's impairment under a five-step sequential evaluation process set forth in the regulations promulgated by the Social Security Administration ("SSA").  *See* 20 C.F.R. § 416.920.  The hearing officer must determine whether: (1) the claimant is engaged in substantial gainful activity; (2) the claimant suffers from a severe impairment; (3) the impairment meets or equals a listed impairment contained in Appendix 1 to the regulations; (4) the impairment prevents the claimant from performing previous relevant work; and (5) the impairment prevents the claimant from doing any work considering the claimant's age, education, and work experience.  *See id; see also Goodermote v. Sec'y of Health & Human Servs.*, 690 F.2d 5, 6-7 (1st Cir. 1982) (describing the five-step process).  If the hearing officer determines at any step of the evaluation that the claimant is or is not disabled, the analysis does not continue to the next step.  20 C.F.R. § 416.920(a)(4).

Before proceeding to steps four and five, the Commissioner must make an assessment of the claimant's RFC, which the Commissioner uses at step four to determine whether the claimant can do past relevant work and at step five to determine if the claimant can adjust to other work.  *See* 416.920(e).

> RFC is what an individual can still do despite his or her limitations.  RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities

Social Security Ruling ("SSR") 96-8p, 1996 WL 374184, at *2 (July 2, 1996).

The claimant has the burden of proof through step four of the analysis, including the burden to demonstrate RFC. *Flaherty v. Astrue*, Civil Action No. 11-11156-TSH, 2013 WL 4784419, at *8-9 (D. Mass. Sept. 5, 2013) (citing *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004)). At step five, the Commissioner has the burden of showing the existence of jobs in the national economy that the claimant can perform notwithstanding his or her restrictions and limitations. *Goodermote*, 690 F.2d at 7.

B.     Standard of Review

The district court may enter a judgment affirming, modifying, or reversing the final decision of the Commissioner, with or without remanding for rehearing. *See* 42 U.S.C. § 405(g). Judicial review "is limited to determining whether the ALJ used the proper legal standards and found facts upon the proper quantum of evidence." *Ward v. Comm'r of Soc. Sec.*, 211 F.3d 652, 655 (1st Cir. 2000). The court reviews questions of law *de novo* but must defer to the ALJ's findings of fact if they are supported by substantial evidence. *Id.* (citing *Nguyen v. Chater,* 172 F.3d 31, 35 (1st Cir. 1999) (per curiam)). Substantial evidence exists "'if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support [the] conclusion.'" *Irlanda Ortiz v. Sec'y of Health & Human Servs.*, 955 F.2d 765, 769 (1st Cir. 1991) (quoting *Rodriguez v. Sec'y of Health & Human Servs.*, 647 F.2d 218, 222 (1st Cir. 1981)). "While 'substantial evidence' is 'more than a scintilla,' it certainly does not approach the preponderance-of-the-evidence standard normally found in civil cases." *Bath Iron Works Corp. v. U.S. Dep't of Labor*, 336 F.3d 51, 56 (1st Cir. 2003) (citing *Sprague v. Dir., Office of Workers' Comp. Programs*, *U.S. Dep't of Labor*, 688 F.2d 862, 865 (1st Cir. 1982)). In applying the substantial evidence standard, the court must be mindful that it is the province of the ALJ,

and not the courts, to determine issues of credibility, resolve conflicts in the evidence, and draw conclusions from such evidence. *See Irlanda Ortiz*, 955 F.2d at 769. So long as the substantial evidence standard is met, the ALJ's factual findings are conclusive even if the record "arguably could support a different conclusion." *Id.* at 770. That said, the ALJ may not ignore evidence, misapply the law, or judge matters entrusted to experts. *Nguyen*, 172 F.3d at 35.

    III.    <u>Factual Background</u>.

    A.    <u>Plaintiff's Background</u>

Plaintiff was forty-six at the time of the hearing. She had graduated from high school, had an associate's degree, and had worked as a hairdresser and a veterinary technician. She lived with her three children, who ranged in age from twelve to eighteen (A.R. 40, 42). Her most recent employment was as an office manager at a veterinary hospital from June 2012 through May 2013 (A.R. 404). Her employment was terminated because she could not keep up with the requirements of her job (A.R. 403).

    B.    <u>Relevant Medical Records</u>

    1.  Records of Physical Impairments

On May 19, 2009, Philip Hsu, M.D., examined Plaintiff and reviewed her medical records, in which there were abnormal MRIs, including an MRI performed in April 2009, and concluded that her reported symptoms and the MRIs were suggestive of multiple sclerosis ("MS"). Plaintiff's examination was normal. Dr. Hsu initiated treatment for MS (A.R. 744-45). Plaintiff was seen in follow-up on December 28, 2009 by physician's assistant John Wojcik, who noted that Plaintiff was being seen for relapsing/remitting MS and that she continued to do well and had not had any exacerbations. She was sleeping well and was quite active with her children. She was having frequent headaches for which Mr. Wojcik prescribed Amitriptyline

(A.R. 744-45). On March 17, 2010, Plaintiff was seen again by Dr. Hsu, who noted that she reported no new neurologic issues, that her mood was fine, and that her headaches had responded to amitriptyline and were dramatically better. Her examination was completely normal (A.R. 741-42). Plaintiff was also seen by Mr. Wojcik on December 7, 2010 and February 18 and June 10, 2011. On February 18, 2011, Plaintiff reported that her husband had had a devastating injury that resulted in neurosurgery. She was beginning to feel financial stresses because her husband had been self-employed. Mr. Wojcik noted that from an MS point of view, Plaintiff was doing well. She had sensory symptoms but without any disability (A.R. 730). On June 10, 2010, Mr. Wojcik noted that, while Plaintiff had not had any acute exacerbations, she had ongoing sensory symptoms, complaints of intermittent numbness in the upper extremities, and pain in both legs that was somewhat problematic. Mr. Wojcik supported Plaintiff applying for social security disability "as this may get worse in the future" (A.R. 725).

A brain MRI done on February 25, 2011 revealed multifocal T2 hyperintense lesions compatible with MS "seen throughout the supratentorial white matter with involvement of the corpus callosum." The lesions were essentially unchanged from a prior scan in size and configuration with the exception of a minimum increase in one lesion (A.R. 725). A cervical scan showed two right-sided lesions at C3 and C5 that were unchanged from a prior scan (A.R. 578, 725).

Plaintiff had a follow-up visit for relapsing/remitting MS with Mr. Wojcik on October 24, 2011. She reported she had not had any acute exacerbations and had been quite stable. She had a little bit of numbness in her left leg that came and went but had no problems with balance, bladder control, mood, or memory (A.R. 578). Her speech was clear and she walked with a normal gait. Mr. Wojcik assessed Plaintiff as "doing well clinically." She reported that her

husband had moved forward with divorce and she was at home with their three biological children. Mr. Wojcik suggested that, if possible, she should take a little time to rest during the day so she would have adequate energy when her children came home (A.R. 579).

Plaintiff saw Dr. Hsu on February 29 and August 24, 2012. In February 2012, she reported that she had not had any new exacerbations and had no new neurologic complaints. She had not had any headaches. She continued to have some numbness in her leg (A.R. 562, 570). By August 2012, she had started a new job and had some increase in her headaches, for which Dr. Hsu prescribed Topamax at a low dose as a prophylaxis. On both dates, Plaintiff's examination was essentially normal. Dr. Hsu's impression was relapsing/remitting MS that appeared to be stable (A.R. 562).

Plaintiff returned to Dr. Hsu on January 16, 2013. At this time, she reported that she had no "frank" exacerbations of MS but was experiencing some eye pain and increased difficulty finding words. She had some mild headaches for which she was taking over-the-counter medication rather than Topamax. Plaintiff's examination was, for the most part, normal. Dr. Hsu's impression was that she had relapsing/remitting MS with many vague symptoms that he suspected, but could not confirm, were MS-related (A.R. 554-55). Plaintiff was seen by Mr. Wojcik on January 10, 2014. She had not had any acute exacerbations of MS. She reported some blurring in her right eye, occasional word finding difficulty, and numbness in her face and hands. On this date, she elected treatment of her MS with Tecfidera (A.R. 540).

Plaintiff had routine check-ups at Quabbin with nurse practitioner Rosario Nelson on January 14 and February 28, 2014 (A.R. 626, 631). She reported no acute MS exacerbations. Her on-going symptoms included some blurring and pain in her right eye, occasional difficulty finding words, numbness in her hands and face that waxed and waned but never went away,

bladder urgency without incontinence, and balance problems. Her memory and mood were generally good, but she kept lists to avoid forgetting activities with her children (A.R. 631). On examination, she walked with a normal gait. A recent MRI brain scan showed no significant changes compared to a prior study from January 21, 2013 (A.R. 634).

Plaintiff returned to see Mr. Wojcik on April 8, 2014. She reported that she had not had any acute exacerbations since her last visit. She had some blurring of her vision from time to time, and on-going numbness in her feet and hands, causing problems with picking up objects. She had no problem with balance or bladder control. Her mood was generally good, but she was sometimes overwhelmed in the role of a single parent since her divorce. She was having more headaches associated with nausea and rare vomiting (A.R. 531). On examination, Mr. Wojcik noted that she was alert, in good spirits, walked with a normal gait, and had no facial or other weakness. Mr. Wojcik noted that Plaintiff had been "relatively stable" with some worsening headaches for which he prescribed an increased dosage of Topamax (A.R. 532).

Plaintiff was seen at Quabbin on June 24, 2014 for dysphagia (A.R. 617). Ms. Nelson's impression was that the condition was worsening (A.R. 617). On July 8, 2014, Plaintiff had an endoscopy (A.R. 604). No abnormalities were found (A.R. 604-05). Thereafter, Plaintiff attended therapy. Her ability to swallow was improving by June or July of 2014, and she was discharged from therapy in or around September 2014 (A.R. 749-50, 752). At a September 8, 2014 visit with nurse practitioner Michelle Sheehan, however, Plaintiff reported that she still felt like she had a lump in her throat and that it felt like food got stuck. She had lost an additional six pounds (A.R. 647). On examination, she was noted to be very thin. She was alert and oriented with fluent language and normal comprehension (A.R. 649). MRIs from August 2014 were consistent with the MS diagnosis but showed no new or enhancing lesions. Plaintiff was

continued on Tecfidera for MS, Topamax for her headaches, and Meclizine for vertigo (A.R. 650).

At a September 23, 2014 appointment with Dr. Hsu, Plaintiff reported that she felt her fibromyalgia was acting up a bit, resulting in diffuse pain. In response, Dr. Hsu prescribed Gabapentin. Plaintiff's vertigo was manageable. Her headaches were unchanged and responding to Topamax. On examination, Dr. Hsu observed that Plaintiff had "grossly normal strength and normal gait" with no ataxia. Overall, the impression was that Plaintiff had relapsing/remitting MS that appeared stable (A.R. 642).

On October 16, 2014, Plaintiff was seen by primary care providers for left shoulder pain that was aggravated by any movement of her arm. She had not used over-the-counter medication for the pain, which she did not believe was related to joint pain she experienced because of MS and fibromyalgia (A.R. 608). A left shoulder x-ray taken that day was negative, showing an unremarkable glenohumeral joint, no bone lesion, and no erosion or soft tissue calcifications (A.R. 595). Plaintiff's left shoulder pain improved but did not resolve following a corticosteroid injection (A.R. 859, 864).

On March 3 and June 4, 2015, Plaintiff saw different nurse practitioners at Baystate Neurology (A.R. 712-19). Plaintiff had MRIs of her brain and cervical spine on March 16, 2015. Neither showed any changes from prior MRIs. Plaintiff's MS was judged stable on Tecfidera. Her gait was normal. She continued to experience aches from fibromyalgia, which were treated with Gabapentin, and headaches, which were treated with Topamax and over-the-counter pain relievers. In June 2015, the treating nurse practitioner observed some psychomotor slowing and that Plaintiff's thought process seemed to be slow. She nonetheless had a good fund of knowledge, good comprehension, and answered questions appropriately (A.R. 714).

At a May 5, 2015 annual appointment with Ms. Nelson, Plaintiff said that, overall, she felt well. She continued taking Tecfidera and had not had any MS flare-ups. She was taking Topamax for chronic headaches, occasionally supplemented by Ibuprofen. Gabapentin was somewhat helpful with the aches in her arms, shoulders, and leg, and she was tolerating the condition well. The dysphagia came and went. On examination, Plaintiff's gait, coordination, and motor strength appeared within normal limits, as did her mood and affect, appearance, speech, and thought processes. Ms. Nelson judged Plaintiff's MS to be stable and outlined an approach for treating her weight loss, which was characterized as abnormal, with a question as to whether the condition was related to MS or to stress and anxiety. There was no change in Plaintiff's lengthy list of prescribed medications (A.R. 675-81).

Plaintiff was in a car accident in August 2015. She was seen at Ludlow Eye Associates for a report of eye pain following the accident (A.R. 873). The records reflect that Plaintiff's distance vision was very good. Her near vision was blurry but was "ok" if she pulled her reading material a little further back (A.R. 874). The records refer to a history of optic atrophy and the possibility of a slightly enlarged blind spot (A.R. 876). Plaintiff treated at Quabbin with a nurse practitioner following the motor vehicle accident, where she reported moderate left shoulder pain, neck pain, and muscle aches which were aggravated by movement such as a lateral rotation of her spine, lifting, and twisting. She had gone to a wedding over the weekend at which she was dancing, and she felt sore the next day. The pain in her right eye had subsided. Her gait and motor strength were within normal limits, as were her mood and affect, appearance, and speech. X-rays of her thoracic spine showed no acute findings (A.R. 881, 889).

On May 16, 2016, Plaintiff saw Ms. Nelson at Quabbin. She reported that on most days, her headaches were in the "background" with more severe headaches occurring about once a

week. Her symptoms from fibromyalgia were fairly stable with good and bad days. She was experiencing some numbness and tingling in various parts of her body and reported some word finding difficulties at times. A primary complaint at this visit was about cysts that had developed on her right and left hands. Plaintiff was referred to a specialist for treatment of the cysts (A.R. 1002-03, 1007).

On April 21 and October 21, 2016, Plaintiff had appointments with nurse practitioner Carol Zimmerman at Baystate Neurology. In April, she reported worsening fatigue that was overwhelming and an increase in numbness and tingling in her face and arms. She had daily headaches that were sufficiently serious once or twice a month to keep her in bed for the day. She told Ms. Zimmerman that she had longstanding issues with insomnia. On examination in April 2016, Ms. Zimmerman noted that Plaintiff looked fatigued. She exhibited some psychomotor slowing, but had a good fund of knowledge, followed commands well, and answered questions appropriately. Her motor strength was intact, and her station and gait were steady. Brain and cervical spine MRIs from March 11, 2016 showed no changes and no enhancements, and Ms. Zimmerman characterized Plaintiff's MS as stable from a radiographic standpoint and likely clinically as well. Ms. Zimmerman indicated that Plaintiff's fatigue might be related to her MS, but that it seemed more likely related to her sleep problems (A.R. 949-52). In October 2016, Plaintiff was upset because, although her pain was well controlled, she was always fatigued. She continued to have headaches on a daily basis. The examination findings in October 2016 were consistent with those made in April 2016 (A.R. 956-59).

Plaintiff returned to Baystate Neurology on March 2, 2017 for a follow-up visit with Dr. Hsu. In Dr. Hsu's report to Plaintiff's primary care provider, he indicated that Plaintiff did not have any real new problems since her last visit but felt that overall her memory was perhaps a

little worse and her headaches were persistent. Dr. Hsu reported that the results of the thorough examination he conducted were normal. His impression was that Plaintiff had relapsing/remitting MS that was clinically and radiographically stable. Plaintiff reported worsening memory problems that Dr. Hsu suspected were not directly from MS. Dr. Hsu nonetheless ordered a new brain MRI, which was done on or around March 10, 2017 and showed no progression of Plaintiff's MS (A.R. 966-67).

On May 18 and June 21, 2017, Plaintiff had appointments with Ronald Beauzile, M.D., her primary care provider. The reason for the May visit is described as low back pain that had persisted for many months and worsened over the last four weeks, psoriasis on her eyelids, and a lingering thumb injury (A.R. 984). On examination, Plaintiff was described as being in no apparent distress (A.R. 987). She was given information on back exercises and prescribed ointment for her eyelids (A.R. 988). When Plaintiff followed up with Dr. Beauzile in June 2017, her back pain had diminished, but her right thumb remained painful (A.R. 979).

Plaintiff returned to Quabbin for an annual physical by Ms. Nelson on August 15, 2017. Plaintiff reported that, overall, she felt well. She was being treated for anxiety and depression, saw Dr. Hsu at Baystate Neurology for MS, and Dr. Babinski for changes in her vision related to MS (A.R. 1169). On examination, Ms. Nelson observed that Plaintiff's gait, coordination, motor strength, mood, affect, appearance, speech, and thought processes were within normal limits (A.R. 1173). Her migraines and MS appeared stable (A.R. 1175-76). An x-ray of Plaintiff's sore right thumb showed no fracture, dislocation, or significant degenerative changes. The plan was to continue Plaintiff's current extensive medication regimen, including Effexor, Tecfidera, Topamax, Gabapentin, and Meclizine. Ms. Nelson's notes reflect that she discussed nutrition and regular physical activity with Plaintiff (A.R. 1174-76).

An MRI performed on June 30, 2017 showed a questionable new small nonenhancing plaque in the left dorsal cord. There were stable white matter lesions in the cervical cord and no evidence to suggest active demyelination (A.R. 1105). When Plaintiff was seen at Baystate Neurology on September 27, 2017, Plaintiff reported that her word finding memory was worsening. The treating doctor's impression was that Plaintiff's symptoms remained unchanged other than her reported deficit in finding words (A.R. 1190). Plaintiff was treated with steroids (A.R. 1189). An MRI of Plaintiff's brain showed no changes (A.R. 1189).

2. Relevant Mental Health Records

Plaintiff was referred to Stephane Jacobus, Ph.D., for an initial mental health evaluation on August 22, 2014 during an evaluation of her problem with swallowing and her related weight loss. Plaintiff reported that she was anxious but not depressed. Her biggest problems were pain, fatigue, and concentration problems. She was anxious about her financial situation because she was unable to work. After she was fired by her employer, who was a friend, she realized she was cognitively unable to manage the job and that her cognitive problems had been building up over the last ten years (A.R. 583-84). She had developed strategies to compensate for these cognitive losses. She developed a problem with swallowing in June 2014 and had lost fifteen pounds in the last two months. She reported that she did some walking and had walked/run a 5K in April 2014 (A.R. 584). The symptoms she reported included anxiety, fatigue, sleep problems, irritability, difficulty concentrating, and forgetfulness. Dr. Jacobus' plan was to have Plaintiff return for follow up to work on her goals. Dr. Jacobus diagnosed "anxiety state NOS" and assigned a Global Assessment of Functioning (GAF) score of 60 (A.R. 586-87).[2]

---

[2] "A Global Assessment of Functioning score rates a person's overall level of functioning." *Curley v. Comm'r of Soc. Sec.*, CIVIL ACTION NO. 16-11240-IT, 2017 WL 2624225, at *2 n.5 (D. Mass. May 30, 2017) (Report and Recommendation), *adopted*, 2017 WL 2622745 (D. Mass.

Plaintiff saw Dr. Jacobus for individual psychotherapy beginning on September 9, 2014 and continuing – sometimes intermittently—through at least November 6, 2017.  Plaintiff regularly reported anxiety, fatigue, sleep problems, irritability, concentration problems, and forgetfulness as symptoms and discussed difficult interpersonal relationships with family members and her ex-husband and his family, and frustration with the limits on her daily activities which she attributed to her medical conditions.  She was sometimes tearful and often appeared fatigued and depressed.  She felt her doctors did not believe or validate her reports of physical problems and that she had trouble adjusting to changes and the amount of responsibilities in her life (A.R. 1201).  Spending time with animals – her neighbor's horses and her dogs and cats – energized her (A.R. 1081).  In or around July and August 2016, she was able to spend a week at friend's house dog sitting and reported she would be spending several weeks taking care of her disabled aunt (A.R. 1072).  In August 2017, she put her aunt in a nursing home and cleaned out her aunt's house with help from her mother and stayed at a friend's horse farm taking care of the animals with her children helping with some of the chores (A.R. 1218).  She did not cook or clean much but was able to keep up with her children's sports activities, including traveling to New Hampshire, Cape Cod, and New York City to attend weekend-long tournaments, where, on

---

June 16, 2017).  The use of GAF scores "has recently fallen into disfavor as an assessment tool." *Bourinot v. Colvin*, 95 F. Supp. 3d 161, 178 (D. Mass. 2015).  The SSA has nonetheless indicated that it will continue to receive GAF scores into evidence subject to Administrative Memorandum AM-13066, which guides ALJs "on how to consider GAF ratings."  *Id.* (citing *Hall v. Colvin*, 18 F. Supp. 3d 144, 153 (D.R.I. 2014)).  Generally, a GAF score of 61 to 70 is indicative of some mild symptoms or some mild difficulty in social or occupational functioning; a GAF score of 51 to 60 is indicative of moderate symptoms or moderate difficulty in social or occupational functioning; and a GAF score of 41 to 50 is indicative of serious symptoms or serious impairments in social or occupational functioning.  Am. Psychiatric Assoc., *Diagnostic and Statistical Manual of Mental Disorders* 34 (4th ed. 2000).

occasion, she socialized with friends.  She frequently visit her friend's horses (A.R. 1017, 1027, 1032, 1038, 1046).

Her medical records indicate that she had lost about thirty pounds in six months in 2014 and seemed unconcerned about remaining at a weight of around 100 pounds.  Dr. Jacobus' Axis I diagnosis was initially anxiety state NOS, later changed to generalized anxiety disorder and atypical depression.  Until she ceased using GAF scores, Dr. Jacobus consistently assigned Plaintiff a GAF score of 55 (A.R. 581-82, 683-710, 850-51, 1017-19, 1029, 1035-40, 1046-57, 1060-98).

On November 8, 2016, Plaintiff began treating with licensed social worker Alan Seigel for cognitive behavior therapy and biofeedback to help with her insomnia.  Plaintiff reported on her sleeping difficulties to Mr. Seigel, and that her energy level when she got up in the morning was very poor (A.R. 1058).  Mr. Seigel diagnosed other insomnia not due to a substance or known physiological condition and assigned Plaintiff a current GAF score of 60 (A.R. 1058-59).  Plaintiff saw Mr. Seigel for eight additional appointments in February, March, April, June, July, and September 2017, during which he counseled her on strategies for improving her sleep and recommended behavioral adjustments.  During these appointments, Plaintiff reported sleeping during the day and waking up during the night (A.R. 1043), that familial problems contributed to her sleep difficulties (A.R. 1209), and that she slept with her three dogs and six cats, viewing this as calming (A.R. 1030).  Mr. Seigel assigned current GAF scores ranging from 66 (A.R. 1031) to 62 (A.R. 1022).  Plaintiff initially reported that her difficulties with sleep remained essentially unchanged, but later indicated that she had benefited from using meditation and other skills to which she had been introduced to help her sleep (A.R. 1022, 1209, 1211).  On November 9,

2017, Plaintiff reported that her sleep was terrible because of a problem with one of the dogs sleeping on her bed. Mr. Seigel recorded a current GAF score of 58 (A.R. 1199).

In or around December 2016, Plaintiff and Dr. Jacobus agreed that Plaintiff should be set up for a consultation about possible psychiatric medication (A.R. 1051). Plaintiff began consulting Ruby Kelli, D.O., about medication and, in or around February 2017, was given a prescription for Effexor (A.R. 1046). Dr. Kelli described Plaintiff as a highly anxious woman who had experienced multiple traumatic events that, in combination with medical illness, had led to deteriorating function at home and an inability to work (A.R. 1042). She diagnosed generalized anxiety disorder, PTSD, and major depressive disorder with anxious distress (A.R. 1024). Plaintiff reported that the Effexor was effective. Her state of mind improved and her anxiety was much better (A.R. 1033). By March 2017, she was handling interpersonal relationships more effectively, was less irritable, and felt more able to get out of the house (A.R. 1032). By June 29, 2017, Plaintiff reported that she was handling things much better. Dr. Kelli observed that Plaintiff's speech was fluent and unimpaired and her affect was appropriate (A.R. 1015). In September 2017, Plaintiff reported that the medication was helping her cope with putting her aunt in a nursing home and becoming the aunt's health care proxy. Dr. Kelli reported that Plaintiff's affect was "quite bright" (A.R. 1214).

C.     Opinion Evidence

1.  Consultative Examination

Teena Guenther, Ph.D., conducted a consultative examination on December 15, 2014 on referral from Disability Determination Services ("DDS"). Dr. Guenther noted that Plaintiff's gait and posture were unremarkable, but her motor behavior was on the lethargic side. Although Plaintiff claimed word finding difficulties, her speech was clear and fluent with no expressive or

receptive language deficits.  Her thought processes were coherent and goal directed.  Her affect was mildly dysphoric and she reported frequent anxiety and depression.  Her insight and judgment appeared good.  She presented as a pleasant and sincere woman.

Based on Plaintiff's history, Dr. Guenther estimated that her premorbid intellectual abilities were at least in the average range.  The results on the WMS-IV were not consistent with this estimate.  Test results were variable, ranging from borderline to average range, and might be associated with the cognitive decline reported by Plaintiff, who struggled most with tasks that required her to attend to and retain information presented in auditory form and to retain and learn new information.  Results on a different test indicated mild visual perceptual/visual motor difficulties.

Dr. Guenther opined that Plaintiff's test results were consistent with her report of cognitive difficulties.  She was likely to have difficulties with short-term memory and in attending to and retaining new information.  Difficulty in sustaining concentration was likely to make it difficult for her to persist in activities and complete those activities efficiently.  Her cognitive and psychiatric difficulties were also likely to diminish her ability to tolerate stress.  She was pleasant and capable of relating to others.  Dr. Guenther diagnosed cognitive disorder not otherwise specified, likely secondary to medical conditions; anxiety disorder not otherwise specified; and adjustment disorder with depressed mood.  She recommended that Plaintiff continue with psychiatric treatment and opined that, while Plaintiff's psychiatric prognosis was fair with continued support, her cognitive difficulties appeared long-standing, connected to her medical conditions, and, by implication, not likely to improve (A.R. 664-71).

2.  State Agency Assessments

On May 23, 2014, Richard Cohen, M.D., reviewed Plaintiff's case, noting that she claimed disability based on MS, fibromyalgia, migraines, and a mitral valve prolapse (A.R. 195, 197). He observed that Plaintiff reported memory lapses and that MS affected her concentration, attention, and word retrieval at times, but that she had not alleged any mental impairment per se and was not engaged in any mental health treatment (A.R. 198). He found, based on his review of the records, including the most recent records from Dr. Hsu, that Plaintiff's MS and her migraine headaches qualified as severe impairments. He completed a physical RFC assessment, finding, as to exertional limitations, that Plaintiff could occasionally lift or carry up to 20 pounds; frequently lift or carry up to 10 pounds; stand or walk or sit for up to 6 hours in a normal workday; never climb ladders, ropes, or scaffolds; balance occasionally; and, as to environmental limitations, needed to avoid concentrated exposure to extreme heat and noise (A.R. 200-01). He concluded that she could perform light work and was not disabled (A.R. 202-03).

For purposes of reconsideration, the record was expanded to include the consultative examination performed by Dr. Guenther and updated medical records. Plaintiff's recent weight loss was noted and addressed (A.R. 216). Erik Purins, M.D., conducted the medical portion of the disability determination (A.R. 216). On reconsideration, the DDS examiners concluded that Plaintiff's severe impairments were MS, migraine headaches, fibromyalgia, and anxiety disorders (A.R. 212). Dr. Purins saw no objective data or findings that would require exertional or environmental limitations differing from those previously found by Dr. Cohen (A.R. 214-16).

Lawrence Langer, Ph.D., reviewed records related to Plaintiff's anxiety disorder, which was not a basis on which she had initially claimed disability (A.R. 402). He found that Plaintiff's mental health impairments caused moderate restrictions of activities of daily living; mild difficulties in maintaining social functioning; and moderate difficulties in maintaining

concentration, persistence, and pace, and that she had experienced no episodes of decompensation (A.R. 212). Dr. Langer's conclusions in the mental RFC assessment were that plaintiff had limitations in understanding and memory. While she was not significantly limited in her ability to remember locations and work-like procedures or to understand and remember very short and simple instructions, she was moderately limited in her ability to understand and remember detailed instructions. Dr. Langer opined that Plaintiff would have adequate memory and understanding only for simple 1-2 step tasks. In his view, she also had limitations in sustained concentration and persistence. She was not significantly limited in her ability to carry out very short and simple instructions, to sustain an ordinary routine without special supervision, to work in coordination with or in proximity to others without being distracted by them; or to make simple work-related decisions. She was moderately limited in her ability to carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances. Dr. Langer found that Plaintiff would have adequate concentration, persistence, and pace to perform simple 1-2 step tasks. He further found that Plaintiff's mental health impairments did not result in social interaction limitations. Finally, he found that Plaintiff had adaptation limitations, as follows. She was moderately limited in her ability to respond appropriately to changes in the work setting. She was not significantly limited in her ability to be aware of normal hazards and take appropriate precautions, travel to unfamiliar places or take public transportation, or set realistic goals or make plans independently of others. Dr. Langer concluded that Plaintiff could adequately adapt to infrequent and planned changes in work-like settings (A.R. 216-17).

On reconsideration, Drs. Purins and Langer concurred that Plaintiff was not disabled (A.R. 219).

D.     Hearing Testimony

Plaintiff's December 12, 2017 hearing testimony began with a brief account of her educational and employment history.  She said that she had an associate's degree and had last worked as an office manager at a veterinary practice, a position from which she was fired because she could not do what she needed to do (A.R. 40).  She had three children, ages 12, 15, and 18, whom she drove to various functions, including their sports activities (A.R. 40-41, 60).  She cooked, cleaned, did the laundry, and shopped for food, sometimes with assistance from her children (A.R. 42).  She testified that the main symptoms from her MS were tingling and numbness in her hands and cognitive difficulties that manifested as a problem finding words that seemed to be getting worse.  By December 12, 2017, the date of the hearing, her doctor had referred her for a cognitive evaluation that had not yet taken place (A.R. 40, 43).  She had constant fatigue (A.R. 50).  She had optic neuritis in her right eye but could see with her glasses (A.R. 51).  Her headaches were constant.  Once or twice a month these headaches turned into migraines and sometimes a migraine headache put her in bed (A.R. 52-53).  She had vertigo that was largely controlled by medication (A.R. 54).  Her fibromyalgia, which was diagnosed when she was 21, was, she thought, worst in her neck and shoulders (A.R. 54-55).  She was able to walk a mile loop through the neighborhood although on some days she was unable to walk this far.  She could sit for up to an hour (A.R. 61).

The ALJ asked Andrea Burnett, the vocational expert ("VE"), to assume an individual of Plaintiff's age and educational background with Plaintiff's prior work experience.  The VE was to assume that this individual retained the RFC for light work, could not climb ladders, and

needed to avoid hazards and dangerous machinery, with no more than occasional balancing or climbing. There were restrictions on the use of the dominant upper extremity such that the individual could not perform repetitive overhead work or overhead reaching. She would need to avoid noisy work environments and extreme heat or cold. She would be limited to simple, routine, one-to-two step repetitive tasks which required concentration for two-hour periods. There could be no more than occasional interaction with the general public or with co-workers, and she would be limited to work in the lower one-third of the stress continuum, which the ALJ defined as no independent decision making and no more than occasional changes in her work routine (A.R. 65).

The VE opined that such an individual would be precluded from Plaintiff's past work as an office manager, but could perform other work, including assembler, DOT code 706.684-022, representing unskilled positions of which, when performed at the light exertional level, there were approximately 30,000 jobs nationally and 600 in Massachusetts; inspector, DOT code 559.687-074, representing unskilled positions of which, when performed at the light exertional level, there were approximately 45,000 positions nationally and 800 in Massachusetts; and sorter, also representing unskilled positions of which, when performed at the light exertional level, there were approximately 35,000 positions nationally and 500 in Massachusetts (A.R. 66). The VE further testified that if the hypothetical individual required frequent unscheduled rest breaks and would be off task up to 30% of the day or would miss three or more days of work per month, the individual would be unemployable (A.R. 66-67).

E.      The ALJ's Decision

The case was heard by the ALJ on remand. The Appeals Council directed the ALJ to give consideration to the non-examining source opinions and explain the weight he assigned to

those opinions; give further consideration to Plaintiff's RFC and provide a rationale for the RFC; obtain supplemental evidence from a VE; address the evidence that was submitted in connection with the request for Appeals Council review; and offer Plaintiff an additional hearing (A.R. 15, 242-43). On remand, the ALJ conducted the requisite five-step sequential analysis. He found that Plaintiff had not engaged in substantial gainful activity since March 14, 2014, the date of her application for benefits. He found that she had "the following severe impairments: multiple sclerosis, fibromyalgia, headaches, left shoulder impingement, vertigo and anxiety" (A.R. 17). He further found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. The ALJ gave particular consideration to the criteria set forth in § 1.02 (major dysfunction of a joint(s) due to any cause); § 11.04 (vascular insult to the brain characterized by sensory or motor aphasia, disorganization of motor function of two extremities, or marked limitation in physical functioning and in one of four areas of mental functions); § 11.09 (MS); and § 12.06 (somatic symptoms and related disorders) (A.R. 17).

Because the ALJ found that Plaintiff's anxiety was a severe disorder, he considered the so-called paragraph B criteria, concluding that Plaintiff had moderate limitations in her ability to understand, remember, and apply information; mild limitations in her ability to interact with others; moderate limitations in her ability to concentrate, persist, and maintain pace; and mild limitations in her ability to adapt or manage herself. Because the ALJ did not find marked limitations in at least two areas, or one extreme limitation, he found that the paragraph B criteria were not satisfied, nor did Plaintiff meet the paragraph C criteria (A.R. 18).

After consideration of the entire record, the ALJ found that Plaintiff had the RFC to perform light work as defined by the relevant regulations,[3] except that she would be limited to no more than occasional climbing or balancing, would need to avoid heights, ladders, and hazards including dangerous machinery, would be limited to no repetitive overhead lifting or work with the left upper extremity, would be precluded from exposure to extreme cold, extreme heat, and loud, noisy environments, would be limited to simple repetitive 1-2 step tasks which required concentration for two-hour periods, no more than occasional interactions with members of the general public or co-workers, and no independent decision making or more than occasional changes in the work routine (A.R. 18-19). Relying on the VE's testimony, the ALJ found that there were jobs that existed in significant numbers in the national economy that Plaintiff remained capable of performing notwithstanding her limitations. He found that, while Plaintiff presented sincerely, in light of the record evidence, she was not incapacitated to the extent alleged (A.R. 27). Accordingly, he found that Plaintiff had not been under a disability as defined in the Social Security Act from March 14, 2014, the date of the application, to the date of his decision (A.R. 28).

IV.    ANALYSIS

A.    Alleged Inconsistency Between the ALJ's First and Second Decisions

---

[3] Light work is defined as:

> work [that] involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.

20 C.F.R. § 416.967(b).

Plaintiff's first contention in this appeal is that the ALJ erred as a matter of law because, in his first decision, he found that Plaintiff's severe impairments were "multiple sclerosis; fibromyalgia; headaches; left shoulder impingement; vertigo; a cognitive disorder, NOS; [and] an anxiety disorder" (A.R. 226), while, in his second decision, he omitted a cognitive disorder, NOS from the list of Plaintiff's serious impairments (A.R. 17) without offering any rationale for the change (Dkt. No. 15 at 9-10).

After the ALJ issued his first decision in Plaintiff's case, the case was remanded to him by the Appeals Council with instructions to resolve an inconsistency between his decision and the hypothetical question posed to the VE who testified at the first hearing, and to explain what weight he assigned to the opinion evidence from the state agency consultants (A.R. 242). Plaintiff's contention that the change in the list of serious impairments is a per se error of law "is flawed for a number of reasons." *Nichols v. U.S. Soc. Sec. Admin., Acting Comm'r*, Case No. 16-cv-443-PB, 2018 WL 1307645, at *5 (D.N.H. Mar. 13, 2018) (rejecting the contention that a successor ALJ who had the case on remand from the Appeals Council was bound by the findings of the ALJ to whom the case was initially assigned). First, when the Appeals Council remands a case, the ALJ writes on a blank slate. He or she is not bound by the initial decision. *See id.* (citing cases); *see also Dacosta v. Berryhill*, Case No. 3:17-cv-30085-KAR, 2019 WL 404039, at *11 (D. Mass. Jan. 21, 2019) (citing cases). It is well-settled that "[a]n ALJ's decision on the merits of a disability application does not become final and binding if the Appeals Council vacates that decision and remands the matter for further proceedings." *Kearney v. Colvin*, 14 F. Supp. 3d 943, 949 (S.D. Ohio 2014) (citing *Wireman v. Comm'r of Soc. Sec.*, 60 F. App'x 570, 570 (6th Cir. 2003)). "An ALJ tasked with deciding a remanded claim is not bound by prior conclusions or findings if those conclusions or findings have not been adopted by the Appeals

Council." *Dacosta*, 2019 WL 404039, at *11 (citing *Nichols*, 2018 WL 1307645, at *5).

Second, "as long as his decision is supported by substantial evidence, an ALJ's failure to explain

why or how his … finding[s] deviate[] from that of a since vacated, prior decision does not

constitute a viable basis for reversal." *Nichols*, 2018 WL 1307645, at *5 (citing cases); *cf.*

*Boardway v. Berryhill*, Case No. 3:17-cv-30069-KAR, 2018 WL 4323823, at *17 (D. Mass.

Sept. 10, 2018) (on remand, an ALJ was not bound by her prior assessment of a physician's

opinion; citing 20 C.F.R. § 404.955(a)). "Because the ALJ did not commit an error of law by

revising his finding as to Plaintiff's [serious impairments] without taking new evidence on

remand from the Appeals Council, Plaintiff is not entitled to a remand 'for another Hearing for

clarification on this issue.'" *Dacosta*, 2019 WL 404039, at *11 (quoting Dkt. No. 12 at 11) (Dkt.

No. 15 at 10).

Plaintiff does not argue that the ALJ failed to comply with the Appeals Council's

directions on remand. Furthermore, in seeking remand on this basis, Plaintiff has failed to

demonstrate any prejudice: she ignores that the ALJ's RFC findings in his first decision, which

included restrictions based on cognitive or other mental health limitations, were virtually

identical to the corresponding restrictions in the RFC in his second decision (A.R. 18-19, 229).

The RFC in the May 25, 2016 decision provided, in pertinent part, that Plaintiff:

> would be limited to simple, routine, repetitive 1-2 step tasks which require
> concentration for 2 hour time periods; no more than occasional interaction with
> the general public; no more than occasional interaction with coworkers; limited to
> work in the lower 1/3 of the stress continuum, defined as no independent decision
> making, and no more than occasional changes in the work routine (A.R. 229).

The RFC in the January 19, 2018 decision provided, in pertinent part, that Plaintiff:

> would be limited to simple, routine and repetitive one-two step tasks which
> required concentration for two-hour time periods, no more than occasional
> interaction with co-workers or the general public and would require work in the

lower 1/3 of the stress continuum, defined as no independent decision making required and no more than occasional changes in the work routine (A.R. 19).

In limiting Plaintiff to simple tasks that did not require independent decision making and required few interactions with others, the ALJ included limitations based on Plaintiff's alleged cognitive or other mental health impairments in each of the RFCs he crafted. While there are minor changes in phrasing, it is indisputable that the RFC in the ALJ's January 19, 2018 decision provided for limitations in response to Plaintiff's cognitive and other mental health impairments that were identical to the limitations in the RFC in the May 25, 2016 decision (A.R. 19, 229).

Even if the ALJ erred at step two in his January 2018 decision in omitting a cognitive impairment NOS from the list of Plaintiff's serious impairments, a point on which this court expresses no opinion, "[c]ourts consistently label such omissions as harmless as long as the ALJ finds some severe impairments so that the analysis continues." *White v. Colvin*, No. CA 14-171-S, 2015 WL 5012614, at *8 (D.R.I. Aug. 21, 2015) (collecting cases); *see also Page v. Berryhill*, Case No. 3:17-cv-30093-KAR, 2018 WL 6834594, at *8-9 (D. Mass. Dec. 27, 2018) (a step two error is harmless as long as the ALJ finds other serious impairments, addresses the claimed impairment in his decision, and includes limitations attributable to the omitted impairment in the RFC). Not only were the restrictions associated with Plaintiff's cognitive and mental health impairments virtually identical in the first and second RFCs, but the ALJ's RFC determination in his January 2018 decision was developed with due consideration for the opinion of state agency psychologist Lawrence Langer, Ph.D., who took into account the opinion evidence from consultative examiner Teena Guenther, Ph.D., the only person to diagnose Plaintiff with a cognitive disorder (A.R. 664-71). The ALJ accorded great weight to the opinion of Dr. Langer (A.R. 26) who, he noted, was expert in the evaluation of medical issues in disability claims (A.R. 26). "With an RFC determination appropriately supported by substantial evidence in the form of

[a] state reviewing opinion[] that took the limitations caused by [this] impairment[] into account, remand is not required."  *White*, 2015 WL 5012614, at *9.

B.  Whether there is Substantial Evidence in the Record Supporting the
      ALJ's Evaluation of Plaintiff's Symptoms

Plaintiff's second claim of error is that the ALJ "improperly diminish[ed] the claimant's credibility" and erred by not assessing further limitations in the RFC (Dkt. No. 15 at 11-17). Pursuant to Social Security Ruling 16-3p, 2017 WL 5180304 (Oct. 25, 2017) ("SSR 16-3p"), rather than assessing a claimant's "credibility," an ALJ is directed "to consider all of the evidence in an individual's record when [he or she] evaluate[s] the intensity and persistence of symptoms after [he or she] find[s] that the individual has a medically determinable impairment(s) that could reasonably be expected to produce those symptoms."  *Id.*, at *2. "[R]esolving … conflicts in the evidence, where reasonable minds could differ as to the outcome, is the province of the Commissioner and h[is] designee, the ALJ."  *Dacosta*, 2019 WL 404039, at *13 (citing *Seavey v. Barnhart*, 276 F.3d 1, 10 (1st Cir. 2001)).

In the instant case, the ALJ found that Plaintiff had MS, fibromyalgia, headaches, left shoulder impingement, vertigo, and anxiety (A.R. 17).  He found, after careful consideration, that, while the claimant "presented sincerely" (A.R. 27) and her medically determinable impairments could be expected to produce her claimed symptoms, the evidence in its entirety, including medical records, reports from treating, examining, and consultative sources, and information about Plaintiff's range of daily activities, did not support the claimed intensity, persistence, and limiting effects of those symptoms (A.R. 21, 27).

Plaintiff's recitation of evidence in the record, which, she apparently contends, requires a finding of disability, reflects in large part Plaintiff's reports of her symptoms and limitations.  An ALJ is not required to accept a claimant's subjective assertions about the severity of her

symptoms when, as in this case, the record is short on confirmation by objective evidence of disabling pain or limitations. *See, e.g., Wright v. Barnhart*, 389 F. Supp. 2d 13, 23 (D. Mass. 2005) (the ALJ was not bound by the claimant's subjective claims where they were not sufficiently supported by medial evidence). Plaintiff's MS was regularly judged to be stable clinically and radiologically by Dr. Hsu, her treating neurologist, and his examinations of Plaintiff were essentially normal (A.R. 554-55, 562, 642, 741-42, 966-67). He suspected that Plaintiff's claimed word retrieval difficulties, her main symptom of cognitive impairment, were not directly caused by her MS (A.R. 966-67). Treating nurse practitioners at Baystate Neurology noted that she was stable or doing well clinically (A.R. 532, 737, 742, 579, 949-52). In October 2016, Plaintiff's pain was well-controlled but she was upset because she was always tired (956-59). In May 2015 and August 2017, Plaintiff reported to Ms. Nelson that, overall, she felt well (A.R. 675-81, 979-83). Plaintiff's vertigo was manageable on medication (A.R. 642). Plaintiff's chronic headaches appeared to respond to medication (A.R. 642, 675-81, 714, 1174-76). Medication to treat Plaintiff's mental health impairments, prescribed by Dr. Kelli beginning in or around February 2017, improved her state of mind and her ability to function (A.R. 1033). In June and September 2017, Dr. Kelli reported that Plaintiff's affect was quite bright (A.R. 1015, 1214).

In addition to the ALJ's thorough review of the medical evidence, the ALJ noted that Plaintiff's reported pain, fatigue, and anxiety did not preclude a wide range of daily activities. "SSR 16-3p expressly requires that the ALJ consider an applicant's '[d]aily activities' to 'evaluate the intensity, persistence, and limiting effects of an individuals' symptoms." *Coskery v. Berryhill*, 892 F.3d 1, 7 (1st Cir. 2018) (alteration in original) (quoting SSR 16-3p, 2017 WL 5180304, at *7). Plaintiff was a single parent taking care of three children, a house, and – by

choice – numerous animals. She cooked, cleaned, did laundry, and was not limited in the area of personal care (A.R. 410-12). She drove her children to their sports events, including to weekend tournaments in New Hampshire, New York City, and on the Cape. She cared for her friend's horses and goats when her friend was away. She helped take care of her disabled aunt, served as her aunt's health care proxy, and, with assistance, cleaned out her aunt's house (A.R. 1214, 1218). She acknowledged walking a mile loop in her neighborhood with no problem, although there were days when she could not do it (A.R. 61). It may be the case that Plaintiff's ability to "perform household chores, care for [multiple animals and individuals], shop for groceries, and engage in other daily activities does not necessarily demonstrate that [s]he is able to perform 'light work,'" *Coskery*, 892 F.3d at 7, but it is an inference an ALJ is entitled to draw, when, as in this case, that inference is supported by other evidence on which the ALJ also relied. *See id.*

That other evidence included residual functional capacity reports by state agency consultants, to which the ALJ gave great weight (A.R. 26). The state agency medical and mental health reviewers concurred in concluding that, while Plaintiff had limitations, she did not meet the criteria for a finding of disability (A.R. 202-03, 219). While the record reviews occurred in 2014 and the unfavorable decision under review was not issued until January 19, 2018, an "ALJ may rely on old opinions … if they are not contradicted by other evidence in the record." *Maillet v. Colvin*, Civil Action No. 15-13365-MGM, 2016 WL 3676142, at *5 (D. Mass. July 7, 2016) (citing *Abubakar v. Astrue*, Civil Action No. 11-cv-10456-DJC, 2012 WL 957623, at *12 (D. Mass. Mar. 21, 2012)). Plaintiff has not contended that the ALJ erred in relying on the opinions from the state agency reviewers, nor has she pointed to later additions to the record which contradict the state agency reviewers' findings. It is not clear on what basis she could raise such a contention as the record does not include any RFC reports or assessments from a

treating care provider that establish limitations in Plaintiff's RFC beyond those found by the ALJ.

It is not enough for Plaintiff to point to evidence that she believes would support a finding of disability. She must also show that the ALJ's contrary finding is not supported by substantial evidence in the record. *See Greene v. Astrue*, Civil Action No. 11-30084-KPN, 2012 WL 1248977, at *3 (D. Mass. Apr. 12, 2012) (citing *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389 (6th Cir. 1999); *Rodriguez Pagan v. Sec'y of Health & Human Servs.*, 819 F.2d 1, 3 (1st Cir. 1987); *Fernung v. Astrue*, No. 3:09CV00495, 2011 WL 1234784, at *10 (S.D. Ohio Jan. 26, 2011)). This she has not done. In light of the medical records, the assessments by the state agency consultants, and the evidence of Plaintiff's daily activities, on all of which the ALJ relied, the ALJ's RFC was adequately supported by substantial evidence. Even if a different result might also be supportable, this court must defer to the ALJ's resolution of the conflicting evidence and affirm his decision. *See, e.g., Irlanda Ortiz*, 955 F.2d at 769.

V. CONCLUSION

For the reasons stated above, Plaintiff's motion for judgment on the pleadings (Dkt. No. 14) is DENIED, and the Commissioner's motion to affirm the Commissioner's decision (Dkt. No. 22) is GRANTED. Judgment shall enter for the defendant, and the Clerk's Office is directed to close the case on the court's docket.

It is so ordered.

Dated: January 10, 2020                                    Katherine A. Robertson
                                                          KATHERINE A. ROBERTSON
                                                          UNITED STATES MAGISTRATE JUDGE